### MISSOURI, KANSAS & TEXAS RAILWAY COMPANY OF TEXAS v. SEDALIA T. CARTER.

#### Decided October 26, 1907.

**1.—Master and Servant—Railroad Bridge—Negligent Construction—Evidence.**

In a suit against a railroad company for the death of a fireman on one of its locomotives, caused by the striking of the fireman's head against the post of a bridge over the track, evidence considered, and held sufficient, although circumstantial, to require the submission to the jury of the question of negligence on the part of the defendant in the matter of the construction and main-

tenance of its bridge, and track adjacent thereto, and sufficient to support a finding of the jury that the defendant was negligent in said matters.

#### 2.—Same—Assumed Risk—Contributory Negligence—Issue.

When the evidence does not conclusively establish tha⁺ a risk was known to a servant or was open to common observation, or that in the performance of his duty at the time of the accident he failed to exercise ordinary care, it is the duty of the court to submit to the jury the issues of assumed risk and contributory negligence.

Appeal from the District Court of Hunt County. Tried below before Hon. R. L. Porter.

*T. S. Miller* and *John T. Craddock,* for appellant.—The court erred in refusing to give special charge No. 1, requested by the defendant, directing the jury peremptorily to return a verdict for the defendant, because the evidence failed to show any negligence of the defendant, proximately causing the accident, and failed to show what the deceased was doing at the time of the accident and his own relation thereto, and especially did it fail to show that at the time of the accident the deceased was leaning out from the cab window or from the space between the cab and tender of the engine, keeping a lookout for the train, as in the petition alleged; and in that it failed to show that there was any reason or occasion at the time and place of the accident for the deceased to be leaning out either from the cab window or from the space between the cab and tender, keeping a lookout for the rear of the train. Patton v. T. & P. Ry. Co., 179 U. S., 658; Texas & N. O. Ry. Co. v. Crowder, 63 Texas, 502; Texas & N. O. Ry. Co. v. Crowder, 76 Texas, 500; Murray v. G., C. & S. F. Ry. Co., 73 Texas, 3; Texas & Pac. Ry. Co. v. Shoemaker, 98 Texas, 451; Missouri Pac. Ry. Co. v. Porter, 73 Texas, 304; Galveston, H. & S. A. Ry. Co. v. Smith, 100 Texas, 267; English v. I. & G. N. Ry. Co., 98 S. W. Rep., 913; Neal v. Chicago, R. I. & P. Ry. Co., 2 L. R. A. (N. S.), 905, with authorities cited in notes thereto; Shearman & Redfield, Neg., sec. 57 (4th ed.); Labbatt, Master and Servant, secs. 833, 835, 836, 837 and authorities cited under sec. 837, at pages 2315-19.

*Bennett & Spearman* and *Jones & Connor,* for appellee.—The evidence not only raises the issue of negligence on the part of appellant as submitted by the court in its charge, but also amply sustains the verdict of the jury. Ft. Worth & R. G. Ry. v. Kime, 21 Texas Civ. App., 273; Ft. Worth & R. G. Ry. v. Kime, 54 S. W. Rep., 240 (s. c.); Galveston, H. & S. A. Ry. v. Mortson, 31 Texas Civ. App., 142; International & G. N. Ry. v. Bearden, 31 Texas Civ. App., 58; Missouri, K. & T. Ry. v. Parker, 49 S. W. Rep., 717; Galveston, H. & S. A. Ry. v. Smith, 100 Texas, 267.

TALBOT, Associate Justice.—Mrs. Sedalia Carter, surviving wife of T. O. Carter, deceased, brought this suit against the appellant railway company, in her own right and in behalf of her two minor children and the mother of the deceased, to recover damages

for personal injuries resulting in the death of the said T. O. Carter through the negligence of appellant. The railway company pleaded a general denial, contributory negligence and assumed risk. There was a trial before the court and jury, which resulted in a verdict and judgment in favor of appellant as against the mother of the deceased and in favor of appellee for $19,000, apportioned as follows: $10,000 to Sedalia Carter and $4,500 to each of her minor children.

The evidence is sufficient to warrant the following conclusions of fact: On the morning of November 20, 1905, T. O. Carter was killed while serving appellant in the capacity of fireman on one of its freight trains, at a railroad bridge on its line of road between Greenville and Mineola. He had been in the railway service in different departments for about eight years prior to his death; for the past four years he had been firing on a locomotive engine; for about seven or eight months next preceding his death he had been in the service of the appellant firing an engine of one of its local freight trains running between Greenville and Mineola. The train made the round trip daily except Sunday, and left Greenville about seven o'clock in the morning. Appellant's track runs in a southeasterly direction from Greenville to Mineola and runs in this direction at the bridge where the deceased was killed. The train on which he was fireman left Greenville on its regular run to Mineola on schedule time, and when it reached Haynes Spur, a distance of about nine miles from Greenville, the train stopped and did some switching. This spur is about one-half of a mile from the bridge across Sabine where the deceased was killed. The deceased was putting coal in the firebox of his engine as the train left the spur and at the time he was smoking his pipe. After the train had gone four or five hundred yards from the spur, and when about half way between the spur and bridge the deceased was seen with his head out of the cab window on the fireman's side looking back. This is the last time he was ever seen alive. The train consisted of 25 cars, being about 700 feet in length, and the caboose was attached to the rear end of the train. At the bridge the train was running at the rate of 18 or 20 miles per hour. The track from Haynes Spur to the bridge was slightly down grade. The conductor controlled the movements of the train, and usually upon leaving switches and stations got up in the cupola of the caboose and gave signals which were taken both by the engineer and fireman, and it was their duty to keep a lookout for signals as well as the duty of the fireman to keep a close lookout for the train at all times, to see that it was all right, and it was his duty on leaving stations and switches to look back and see if the train was coming along all right; and the fireman performs the duty of keeping a lookout to the rear of the train by extending his head and a part of his body through and leaning out of the side cab window. If he should be on the space intervening between the engine and tender, he catches hold of the handholds on the tender and the cab and leans out to get a view of the train. If the fireman wants to get a good view he has to look out and put his head and body out beyond the side of the cab,

and he can not get a good view and know what is going on without extending his head and part of his body out. It is the duty of the fireman to keep a lookout except when he is busily engaged in keeping up steam. His duty is to keep lookout both ways. It is the duty of men running an engine on both sides to keep a watch. That is their instructions, that they look out through the window. Sometimes put their heads out. The conductor often sits in the cupola. If the fireman wanted to see the cupola from the cab window he must put his head and part of his body out. Ordinarily, the conductor stays in the cupola when leaving a station, and signals may be expected in the cupola, and if he signals there you can get them from him in the cupola. The engineer is not supposed to look for signals between stations. It is not the fireman's duty to wait until something happens before he makes a lookout. His seat is about eight inches below the bottom side of the cab. He could turn around and look backward or could look through the side window. That is where he makes his observations from ordinarily. If he wanted to look back at the train to observe signals while he was sitting on his seat he would probably look back through the side window in the cab; lean out for that purpose. It was his duty to know what was going on. If he wanted to get a view of the train he would be more likely to lean out. The side window in the cab is about 2x3 feet.

The only other persons, except the deceased, who were on the engine after the train left Haynes Spur were the engineer and the head brakeman, and they were on the engineer's side of the engine on the opposite side of the boiler, which is five feet high, from the fireman's side, and they did not see the deceased after leaving Haynes Spur, and did not miss him until the train had gone a mile beyond the bridge. They immediately backed the train to the bridge and found the body of the deceased in the water in the bed of the river. There was a cut to the bone about two inches long over the deceased's left eye and his head was bruised and the skull broken and crushed just behind the right ear. There were no other wounds on the body except what appeared to be a bursted blood vessel on the throat which made a bulge in the region of the larynx. On the same day of the accident, and soon thereafter, in making observations, a damp, greasy looking splotch, spot or discoloration was discovered by several witnesses on the first column of the fireman's side of the north end of the bridge. It was about 8½ or 9 feet above the track and on the corner of the post next to the track, and about 20½ inches from the side of the engine cab. This spot or splotch was from 1½ inches to 2 inches long, extending up and down on the northwest corner of the first post on the fireman's side. When the post was wet with dew this spot showed to be greasy. It remained on the post for several days after the accident. At the same place on the post there was a slight indentation on the rough surface or fibres of the wood, and a very small splinter, about the size of a pin, had been knocked off of the northwest corner of the post, and it looked to be fresh. Twelve or fifteen feet south of the post with the splotch on it, and on the same side of the track said

post was on, there was a small spot of blood on the iron girder of the bridge. The body of the deceased struck the ground in the mud about 20 feet south and beyond where the blood was seen on the girder and slid into the water. There were no indications or evidence that the deceased struck any other part or portion of the bridge or that his body struck anywhere else until it fell in the mud in the river. Deceased's pipe was found on the side of the bank of the river between the post and the blood on the girder. The bridge where the deceased was killed was a combination span, made of wood and iron. There were four wooden end posts, one at each corner of the bridge, and they leaned toward the center of the bridge at an angle of about 45 degrees. There were four upright posts on each side of the bridge between the two end posts which were a little further from the track than the end posts. On each side of the track were iron girders extending the full length of the bridge between the end posts. It was not shown when the bridge was built nor when it had been inspected or repaired, prior to the accident. The end posts at the north end of the bridge were 1½ inches nearer together than the end posts at the south end of the bridge, and the end post at the north end of the bridge on the fireman's side was an inch closer to the track than the end post on the engineer's side, was out of plumb and leaned west toward the track. The distance between the outside of the rail to the end post on the fireman's side where deceased was killed was four feet four inches. The track was four feet nine inches wide and the cab of the engine from outside wall to outside wall was 10 feet, and the height of arm rest in the window of the cab of the engine where the fireman sat was 8 feet and 2 inches. The cab window was 2 feet by 3 feet. Immediately north of the bridge the dirt was washed out from under the ends of about 13 ties and 4 or 5 of the ties were loose under the rails, and would give and shake with the weight of a man standing on the ends of them. The track for 200 feet before approaching the bridge on the north was on a dump, was uneven, first one side and then the other being an inch to one-half inch higher, and the rail on the east side, that is, next to the fireman's side opposite the first post on the north end of the bridge, was one inch lower than the rail on the west side. The testimony of Cantrell, Kennedy and Herndon, the only witnesses who testified on this point, is to the effect that if the track was in the condition above set out it would cause the engine when running over it to rock, swing and sway. The track immediately north of the bridge had not been resurfaced since the month of June or July prior to the accident in November, and there had been a great many heavy rains in the meantime. The inspection car called the "Dinky" was to follow the train, and it was known by the train crew before they left Greenville that it was to follow their train, but they did not know just how far behind it would be or how near the train it would approach.

We are of the opinion the court did not err in refusing to give appellant's special charge, upon which its first assignment of error is predicated, directing the jury to return a verdict in its favor.

Appellee's theory of the case was and is, in substance, that appellant negligently constructed the first column or post of the north end of the bridge where T. O. Carter was killed and on the side thereof next to the fireman's side of an engine when running south, so near the railroad track, or, for the want of attention and repair, permitted it to get out of plumb and so near the track that a fireman could not, with safety, perform the duties required of him, or that because of the defective condition of the track and the proximity of the post thereto, such duties could not be safely performed; that while the deceased, Carter, was standing on the intervening space between the engine and tender of the train upon which he was at work and leaning out for the purpose of observing signals, or to see that the train was all right, that is, that its several cars were coupled together and moving along without accident or hindrance, or that while with a portion of his body extending or protruding through the window of the cab of the engine for that purpose, as was his duty to do, his head came in contact with said post or column of the bridge and he was thereby killed as alleged. The evidence, although circumstantial, is sufficient, we think, to establish with reasonable certainty, as correct, the foregoing theory of how and under what circumstances the unfortunate accident resulting in Carter's death occurred.

The determination of these questions was not left to mere speculation and conjecture. On the contrary, the facts and circumstances established by the evidence and relied upon by appellee reasonably leads to the inference that the injury which caused the death of T. O. Carter was due to his head striking the post of the bridge in question as he was leaning out from the engine looking for signals or for the train, as it was incumbent upon him to do. As shown by our conclusions of fact, except when engaged in keeping up steam, it was the duty of the deceased to keep the lookout as contended by appellee. To perform this duty it was necessary and usual for him and the other fireman, if at his seat in the cab, to extend his head and a part of his body through the cab window; if standing on the space intervening between the engine and tender he would catch hold of the hand-holds on the tender and the cab and lean out to get a view of the train. The post of the bridge with which appellee claims the deceased's head collided was an inch closer to the track than the end post on the engineer's side, was out of plumb, and leaned west toward the track, and came within about 20½ inches of the cab window when passing that point. So near did it come to the cab that it is reasonable to conclude that if the deceased was looking out of the cab window, or from between the engine and tender, his head, if occupying the usual position, could have come in contact with the post. Upon this post at a height consistent with the height deceased's head would probably have been in keeping the lookout enjoined upon him, was a greasy looking spot or discoloration which might have been made by the head of a person coming in contact with the post. A very short time before the accident occurred deceased was seen with his head out of the cab window on the fireman's side, looking back, which would place his head in a position to be struck on the right side

thereof, if it should come in contact with the post. While greater injury to one's head might have been expected by the blow which is claimed to have caused Carter's death than was found upon his head, yet it is shown that the back of his head was bruised and crushed, and we find no evidence that he struck any object other than the post, except the iron girder some twenty feet south of the post, until he struck the ground. Certainly this and the other evidence in the case tended to show that the deceased came to his death in the manner alleged, and required the trial court to submit, in a charge properly grouping the essential facts, the question of appellee's right to recover. This, we think, the court did, carefully guarding the rights of appellant in every issue raised by the pleadings and the evidence.

What we have said applies to appellant's second, third and fourth assignments of error, which raise practically the same questions embraced in those just discussed, and disposes of them adversely to its contention.

By its fifth, sixth and seventh assignments of error appellant contends that the verdict of the jury, in view of the evidence, is contrary to certain special instructions asked by it and given in charge to the jury. These charges relate to the defenses of assumed risk and contributory negligence. The evidence did not conclusively establish either that the proximity of the post to the railroad track was known to the deceased, or that such proximity was obvious to common observation, or that in the performance of his duties at the time the accident happened resulting in his death the deceased failed to exercise that degree of care to avoid injury to himself that a person of ordinary care would have exercised under the circumstances of the situation. Unless so established the court was not authorized to declare, as a matter of law, the existence of either fact, but was required to submit the matters as issues of fact for the determination of the jury.

Appellant presents several assignments of error complaining of the admission of certain testimony, over its objection, of the witnesses Kennedy and Stonecypher. We think there was no error in the admission of any of this testimony, but if error should be conceded the same must be regarded as harmless for the reason that substantially the same testimony was given by other witnesses and admitted without objection.

Nor do we think either the fourth or fifth paragraphs of the court's charge subject to the criticism that it is upon the weight of the evidence, or otherwise materially defective, as urged in appellant's sixteenth and seventeenth assignments of error. Clearly, the jury were required to find from the evidence whether or not the facts grouped in these paragraphs of the charge existed. If they did it can hardly be seriously contended that appellee failed to show sufficient facts to authorize a recovery. The failure of said charges to expressly require the jury to find whether or not the deceased, at the time and place of the accident, was leaning out from the cab window or from the space between the cab and tender, keeping a lookout for the train or signals, did not, in our opinion, probably mislead the jury or give to the charges the effect of assuming the existence of those facts, or any other fact, as claimed by appellant. Besides, in a special charge requested

by appellant upon the subject of contributory negligence, the jury were instructed that, if they believed from the evidence that, at the time of the accident resulting in his death, the deceased was leaning out of the cab window or from the space between the cab and tender, looking out for or toward the rear of the train, yet if they believed that' at such time and place a man of ordinary care and prudence, under like conditions and circumstances and information, if any, as the deceased had, would not have been so leaning out, etc., to find for defendant.

In reference to the fifth paragraph it may be further said that the defective condition of the track was not submitted as a separate act of negligence and distinct ground of recovery. The issue as to the condition of the track was simply submitted and the jury authorized to consider same, if found to be defective as alleged, in connection with the location of the post in question in determining whether the post, under the circumstances, was too near the track for the deceased to perform his duty with safety.

Appellant's twentieth assignment of error complains that the verdict of the jury is excessive. This assignment must also be overruled. The verdict seems large, but there is evidence authorizing the amount awarded, and none tending to show that it is the result of passion, prejudice or any other improper motive; nor is it so excessive as to justify the inference that the jury were influenced by any such considerations. Upon the whole, we conclude that none of the assignments of error point out any sufficient reason for reversing the case; that the evidence is sufficient to show that the death of T. O. Carter was the result of appellant's negligence, as alleged; that he did not assume the risk of the accident resulting in his death, and was not guilty of contributory negligence. The judgment of the court below is therefore affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

The questions presented by appellant's motion for a rehearing were carefully considered before the original opinion was written. No satisfactory reason appears why we should change the views there expressed. In addition, however, to the special charge referred to in our opinion in support of the disposition made of appellant's sixteenth and seventeenth assignments of error complaining of the fourth and fifth paragraphs of the court's main charge, the court gave, at the instance of appellant, the following charge, to which we now call attention: "You are instructed that if you believe from the evidence that the deceased, T. O. Carter, at the time of the accident, was not keeping a lookout from the cab window, or from the space between the cab and the tender; or if you believe from the evidence that he was doing anything else other than keeping such lookout at the time of the accident, you will find for the defendant." This charge more fully, perhaps, answers the objections urged by appellant than the one referred to in the original opinion.

In appellant's motion for a rehearing we are also asked to modify our conclusions of fact with respect to the space between the wall of

the cab and end post of the bridge with which it is alleged the deceased's head came in contact, and as to the distance from the north end of the bridge to the dirt embankment of appellant's roadbed. After a more careful examination of the testimony we think some modification of our conclusions as to these matters should be made, and therefore find in relation thereto as follows: The wall or side of the engine cab was about 25 inches from said post of the bridge, but the arm rest of the cab window extended out beyond the side of the cab about 3½ inches, and the distance between the arm rest of the window of the cab and said post was about 21½ inches. Extending north for about twelve feet from the north end of the bridge where the deceased was killed there was trestle work forming appellant's roadbed to the approach of said bridge, and the dirt embankment of said roadbed was therefore distant from the north end of said bridge about twelve feet.

The motion for rehearing is overruled.

                                                    *Overruled.*

Writ of error refused.